## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

BRIAN E. CLOUSE, STEVEN S. KAWAKAMI,
DOUGLAS E. HOFFELT, and MICHAEL
WINKLER, individually and as representatives of
a class of participants and beneficiaries on behalf
of the NORTHROP GRUMMAN SAVINGS
PLAN,

     c/o Sean Patrick Roche, Esq.
     CAMERON INGERSOLL ROCHE PLLC
     4100 Monument Corner Dr., Ste. 420
     Fairfax, VA 22030

                    *Plaintiffs*,

  v.

NORTHROP GRUMMAN CORPORATION
     SERVE: CT Corporation System
     4701 Cox Rd., Ste. 285
     Glen Allen, VA 23060-6808

and

NORTHROP GRUMMAN BENEFIT PLAN
ADMINISTRATIVE COMMITTEE
     SERVE: Northrop Grumman Benefit Plans
     Administrative Committee
     2980 Fairview Park Drive
     Falls Church, VA 22042-4511

and

JOHN DOES 1–17,

                    *Defendants*.

Civil Action No.: 1:25-cv-00767

**JURY TRIAL DEMANDED**

1

## CLASS ACTION COMPLAINT

1.      Plaintiffs Brian E. Clouse, Steven S. Kawakami, Douglas E. Hoffelt, and Michael Winkler (the "Named Plaintiffs"), individually and as representatives of a class of participants and beneficiaries (the "Class Members" and, together with the Named Plaintiffs, the "Plaintiffs") of the Northrop Grumman Savings Plan (the "Plan"), bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3) against Defendants Northrop Grumman Corporation ("NG"), the Northrop Grumman Benefit Plan Administrative Committee (the "Committee"), and John Does 1–17 (the "John Doe Defendants" and, together with NG and the Committee, the "Defendants") for breaches of fiduciary duty, prohibited transactions, and other violations of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1001–1461 ("ERISA").

2.      As Plan fiduciaries, Defendants were obligated to act for the exclusive benefit of Plan participants and beneficiaries and ensure they act loyally and prudently when administering the Plan. These fiduciary duties are the "highest known to the law." *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763, 770 (4th Cir. 2019) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). However, rather than using the Plan's forfeiture assets to pay *all* Plan administrative expenses, as expressly required by the terms of the Plan, Defendants used Plan assets to benefit themselves by reducing NG's employer matching contributions using the Plan's forfeiture assets. Their conduct was contrary to the Plan's express terms and a direct violation under 29 U.S.C. § 1104(a)(1)(D). Under the same facts and circumstances, Defendants separately breached their fiduciary duties of loyalty and prudence under § 1104(a)(1)(A)–(B), violated the anti-inurement provision under § 1103(c)(1), enabled breaches of fiduciary duty by co-fiduciaries under § 1105(a), and committed prohibited transactions under § 1106. Additionally, Defendants deliberately and

repeatedly failed to provide Plaintiffs with Plan information within thirty (30) days of each request for such information, in violation of §§ 1024(b)(4) and 1132(c)(1)(B).

3.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action under 29 U.S.C §§ 1132(a)(2) and (a)(3) to enforce Defendants' obligation under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, and further to restore to the Plan all of Defendants' profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek to enjoin any act or practice that violates ERISA or the terms of the Plan and "other appropriate equitable relief" to redress "any act or practice" that violates ERISA or the terms of the Plan. 29 U.S.C. § 1132(a)(3); 29 U.S.C. § 1109(a). As explained in detail below, by unlawfully charging Plan administrative expenses to Plaintiffs' retirement accounts in violation of ERISA, Defendants engaged in and continue to engage in conduct that must be redressed and enjoined.

## JURISDICTION AND VENUE

4.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and (a)(3).

5.      **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District where at least one of the alleged breaches took place and where at least one Defendant resides, may be found, or regularly transacts business in-person.

6.      **Standing.** An action under § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). A plan is the victim of any fiduciary breach and the recipient

3

of any recovery. *Id*. at 254. Plan participants have individual accounts which are harmed when the Plan is harmed. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plan.

7.      To the extent Plaintiffs must also show individual injuries, Plaintiffs have suffered such injuries from being subjected to the fiduciary breaches alleged herein, including by having improper and/or excessive fees deducted from their Plan accounts. These fees would not have been incurred but for Defendants' misconduct and self-dealing, thereby reducing the value of Plaintiffs' retirement assets. Because Plaintiffs had their retirement benefits diminished by fees that Defendants were obligated to pay, Plaintiffs' retirement assets are less valuable.

8.      Moreover, when Plaintiff Kawakami requested, in writing, that Defendants produce a copy of the most current documents governing the Plan, Defendants repeatedly and deliberately failed to produce those documents within thirty (30) days, directly violating Sections 104(b)(4) and 502(c)(1)(B) of ERISA, 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B.

## PARTIES

### I.    Plaintiffs

9.      Brian E. Clouse is domiciled in Oviedo, Florida, is a citizen of the State of Florida, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Clouse began employment with NG in 2016. Mr. Clouse worked in the Manned Aircraft Design Center of Excellence as a Senior Principal Engineer – Systems Architect, and began investing in the Plan in 2016. Mr. Clouse's employment with NG ended in 2024, but Mr. Clouse remains an active

participant in the Plan. As alleged more fully herein, Mr. Clouse's Plan account was improperly charged with administrative fees. But for Defendants' conduct alleged herein, Mr. Clouse's Plan account would not have been improperly charged such administrative fees.

10.    Steven S. Kawakami is domiciled in Mount Airy, Maryland, is a citizen of the State of Maryland, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Kawakami began employment with NG's predecessor, Westinghouse Electric Corporation, in 1983. Mr. Kawakami worked in the Human Resources Department as a Human Resources Manager, and invested in the Plan during his multiple decades of employment with NG. Mr. Kawakami's employment with NG ended in 2016, but Mr. Kawakami remains an active participant in the Plan. As alleged more fully herein, Mr. Kawakami's Plan account was improperly charged administrative fees. But for Defendants' conduct alleged herein, Mr. Kawakami's Plan account would not have been improperly charged with such administrative fees. Additionally, and as alleged more fully herein, on at least two occasions Mr. Kawakami requested Plan documents from Defendants, but Defendants repeatedly and deliberately failed to provide those Plan documents to Mr. Kawakami within thirty (30) days. But for Defendants' conduct, Mr. Kawakami would have had possession of the Plan Document (defined *infra* ¶ 35) by no later than December 11, 2024, and he would have filed this Action months ago.

11.    Douglas Hoffelt is domiciled in Lancaster California, is a citizen of the State of California, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Hoffelt began employment with NG in approximately 1987. Mr. Hoffelt worked in the Flight Test Department as a Staff Engineer and began investing in the Plan in approximately 1987. Mr. Hoffelt's employment with NG ended in 2024, but Mr. Hoffelt remains an active participant in the Plan. As alleged more fully herein, Mr. Hoffelt's Plan account was improperly charged

administrative fees. But for Defendants' conduct alleged herein, Mr. Hoffelt's Plan account would not have been improperly charged with such administrative fees.

12.     Michael Winkler is domiciled in Fond du Lac, Wisconsin, is a citizen of the State of Wisconsin, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Winkler began employment with NG in 2022. Mr. Winkler worked in the Product Support Department as a Program Manager, and began investing in the Plan in 2022. Mr. Winkler's employment with NG ended in 2024, but Mr. Winkler remains an active participant in the Plan. As alleged more fully herein, Mr. Winkler's account was improperly charged administrative fees. But for Defendants' conduct alleged herein, Mr. Winkler's Plan account would not have been improperly charged with such administrative fees.

## II.    Defendants

13.     Northrop Grumman Corporation is a publicly traded corporation organized and existing under the laws of the State of Delaware, authorized to do business in the Commonwealth of Virginia, with its headquarters and principal place of business situated at 2980 Fairview Park Drive, Falls Church, Virginia, which is located within the Eastern District of Virginia. According to NG, it is a leading global aerospace and defense technology company that delivers products, services, and other solutions "principally" to the United States Department of Defense, and to the American intelligence community. As of December 31, 2024, NG reported that it had approximately 97,000 employees.

14.     NG is, and at all relevant times was, the Plan's sponsor under 29 U.S.C. § 1002(16)(B). NG also is a named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2). NG served in these roles throughout the Class Period. In these capacities, NG conducted substantial and

continuous business in Falls Church, Virginia, including from its corporate offices located at 2980 Fairview Park Drive, Falls Church, Virginia.

15.    As alleged herein, NG exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. §§ 1002(21)(A)(i), (iii).

16.    The Northrop Grumman Benefit Plan Administrative Committee  is and at all relevant times was the Plan's administrator pursuant to 29 U.S.C. § 1002(16)(A)(i). According to Article 16 of the Plan Document, the Committee also is and at all relevant times was a named fiduciary of the Plan pursuant to 29 U.S.C. § 1102(a)(2). The Committee has and at all relevant times had fiduciary responsibility for the Plan. At all relevant times, the Committee's members were appointed by NG's Chief Executive Officer, served at the pleasure of NG's Chief Executive Officer, and were not compensated for their roles as Committee members.

17.    As alleged herein, the Committee exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. §§ 1002(21)(A)(i) and (iii). Specifically, NG, through the operative Plan Document, delegated discretionary authority to undertake certain fiduciary acts. By reason and by way of this delegation, the Committee was authorized and acted, among other things: (1) to prescribe rules for the Plan's operation; (2) to determine eligibility for Plan benefits; (3) to prepare and distribute communications to participants concerning the Plan; (4) to prescribe forms to

facilitate the Plan's operation; (5) to determine the amount of benefits and authorize payments from the Plan's trust fund; (6) to litigate on the Plan's behalf; and (7) to execute contracts on the Plan's behalf. The Committee's express consent was required before any Plan expenses were to be paid.

18.     John Does 1–17 were at all relevant times members of the Committee who exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the administration, management or disposition of Plan assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, were fiduciaries to the Plan under 29 U.S.C. §§ 1002(21)(A)(i) and (iii). Notwithstanding Plaintiffs' diligent efforts to identify the appropriate individuals in advance of filing this Complaint, Plaintiffs have been unable to ascertain any of the John Doe Defendants' identities. According to Article 16 of the Plan Document, each of John Does 1–17 was a named fiduciary under the Plan pursuant to 29 U.S.C. § 1102(a)(2). Plaintiffs will seek leave to amend the Complaint to name each of these John Doe Defendants once Plaintiffs ascertain the identities of these individuals. In this Complaint, the term "Committee" includes John Does 1–17.

19.     Despite the delegation of fiduciary authority to the Committee, Defendant NG retained an ongoing duty to monitor the conduct of the Committee to assure that the Committee and its individual constituent members were complying with ERISA's requirements. At all relevant times, the Committee consisted of members appointed by NG's Chief Executive Officer who served at the pleasure of NG's Chief Executive Officer, and, according to the Plan Document (defined *infra* ¶ 35), the members of the Committee were to serve "without compensation."

## ERISA'S FIDUCIARY STANDARDS

20.    In Section 404(a) of ERISA, Congress established strict fiduciary duties of loyalty and prudence for fiduciaries of non-exempt ERISA plans. *See* 29 U.S.C. § 1104(a). At all relevant times, Section 404(a)'s statutory fiduciary duties governed the Defendants' conduct as fiduciaries of the Plan. The statute provides, in relevant part, that:

> [A] fiduciary **shall** discharge his duties with respect to a plan **solely in the interest of the participants** and beneficiaries **and** –
>
> (A)    for the **exclusive** purpose of
>
>> (i) providing benefits to participants and their beneficiaries; and
>> (ii) **defraying reasonable expenses of administering the plan**;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; and
>
> [. . .]
>
> (D)    **in accordance with the documents and instruments governing the plan** insofar as such documents and instruments are consistent with the provisions of [ERISA, with exceptions not applicable here].

29 U.S.C. § 1104(a)(1) (emphases added).

21.    Under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the *exclusive* benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also id.* §

1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

22.    Congress also recognized that certain types of transactions are so susceptible to abuse by fiduciaries that a supplemental statute was necessary, and so it enacted Section 406 of ERISA. Section 406(a) prohibits ERISA plan fiduciaries from causing their plans to engage in certain specific transactions with parties-in-interest. In pertinent part, ERISA Section 406(a) provides that, among other things and with exceptions not applicable here, an ERISA plan fiduciary

> [S]hall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a)(1).

23.    Congress also recognized that ERISA fiduciaries, by virtue of their responsibilities, would have ample opportunity to engage in transactions whereby they: (1) engage in self-dealing with plan assets; (2) act as fiduciaries to the plan in the transaction while also representing or acting on behalf of other parties to the transaction whose interests are adverse to the plan, its participants, or its beneficiaries; and (3) receive consideration from any party to the transaction for performing the transaction. So, in Section 406(b) of ERISA, Congress flatly prohibits, *with no exceptions*, transactions whereby an ERISA fiduciary engages in a transaction (1) that is tantamount to fiduciary self-dealing, (2) in which the fiduciary has a conflict of interest, or (3) in which the

fiduciary receives consideration (i.e., "kickbacks") for executing the transaction. The statute

provides, in full, that

> A fiduciary with respect to a plan shall not—
>
> > (1) deal with the assets of the plan in his own interest or for his own account,
> >
> > (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> >
> > (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

24.    "Section [1106](b) prohibits a plan fiduciary from engaging in various forms of

self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual

loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and

beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J.), quoting H.R. Rep.

No. 93-1280 (1974)).

25.    According to the United States Department of Labor (the "DOL"), ERISA's

 Section 406(b)'s

> [P]rohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b-2(e)(1).

26.    Section 405(a) of ERISA expressly provides for co-fiduciary liability among plan

fiduciaries, and further establishes a private right of action against an ERISA plan fiduciary (1) for knowingly participating in, attempting to conceal, or failing to cure, breaches of fiduciary duty by another plan fiduciary; or (2) who, by reason of breaching its own ERISA fiduciary duties, enables breaches of fiduciary duty by another plan fiduciary. The statute provides, in relevant part, that

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

## FACTS APPLICABLE TO ALL COUNTS

### I.    The Impact of Fees on Defined Contribution Plans

27.    "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). They have become America's retirement system. In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[1] The

---

[1] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. In short, defined contribution plans have become America's retirement system.

28.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks, and administrative and investment fees reduce their retirement assets.

29.    Each participant in a defined contribution plan has an individual account and directs plan contributions, both from the participant and from the matching contribution of her employer, into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) (undersigned counsel represented the petitioners in *Tibble*). Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* As the Supreme Court further clarified in *Hughes v. Northwestern University*, 595 U.S. 170, 177 (2022) (undersigned counsel also represented the petitioners in *Hughes*), ERISA's duty of prudence also requires ERISA plan fiduciaries to monitor Plan expenses and, where necessary, to mitigate or minimize those Plan expenses for the benefit of plan participants and beneficiaries.

30.    The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points

(i.e., "bps"). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

31.     The plan's fiduciaries have control over these expenses and other expenses. For example, the fiduciaries are responsible for hiring service providers, such as recordkeepers, trustees, legal counsel, among others and negotiating and approving those service providers' fees that are charged to the plan. Under ERISA, as set forth above, fiduciaries must make sure fees are reasonable.

32.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to DOL, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

33.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants only pay those expenses that are allowed and no more than a reasonable level of those allowable fees.

## II.    The Plan

34.     The Plan is and at all relevant times was a defined contribution, individual account employee pension benefit plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34). The Plan provides "for an individual account for each participant and for benefits based solely upon the amount

---

[2]  U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/8KAR-W4JR.
[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8VCU-E7PC.

contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." *Id.* § 1002(34).

35.    The Plan is and at all relevant times was established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1), amended and restated as of January 1, 2023 (the "Plan Document").

36.    According to Section 2.59 of the Plan Document, the Plan's assets are and at all relevant times were to be held in the Northrop Grumman DC Master Fund (the "Master Trust") pursuant to 29 U.S.C. § 1103(a). NG represented in its Forms 5500 that for Plan Years 2018 through 2022, the Plan comprised approximately 98 percent of the total net assets held in the Master Trust. For Plan Year 2023, NG represented in its Form 5500 that the Plan comprised 99 percent of the total net assets "reported by the Trustee" of the Master Trust.

37.    As of December 31, 2018, the Plan had 69,528 active participants and $22,174,645,282 in total net assets. As of December 31, 2023, the Plan had 104,719 active participants, and $36,162,920,264 in total net assets. As of the date of this filing, NG has not filed a Form 5500 for the Plan with DOL for the year ending December 31, 2024.

38.    Under the Plan, participants are responsible for investing in their individual accounts and receive in retirement only the current value of that account, which will depend on wage withholdings from employees' compensation, on employer matching contributions, and on the performance of investment options net of fees and expenses.

39.    Throughout the Class Period, the Plan was funded by a combination of participant contributions (or wage withholdings) and NG's employer matching contributions, all of which are

deposited in the Plan's Master Trust account and allocated to individual participant accounts. Once deposited, these participant and employer contributions become Plan assets.

40.     Under the terms of the Plan, depending upon the sub-plan in which an employee participated, NG makes and at all relevant times made matching contributions of up to 100% of up to 6% of a participant's eligible compensation for each year during the Class Period. Plan participants' own contributions immediately vest, along with any gains or losses on those balances. NG's matching contributions, and any gains or losses on those balances, become 100% vested upon the earliest of: (1) the date of a participant's normal retirement age; (2) the date of a participant's death; (3) the date a participant becomes disabled; (4) the date on which NG's contributions to the Plan are completely eliminated; (5) the date on which the Plan is terminated; or (6) after a participant completes three years of service. Thus, an employee who leaves NG before completing three years of employment forfeits his or her unvested account balance.[4]

41.     Although these balances were and are forfeited by Plan participants, the assets in those forfeited accounts are transferred to the Plan's forfeiture account and remain Plan assets. As with any Plan assets, Defendants have a continuing duty to monitor and administer these assets in accordance with the Plan and ERISA.

42.     Section 7.04 of the Plan Document requires, and at all relevant times required, that forfeiture assets first be used to pay Plan expenses, and only if there are remaining forfeiture funds available may those remaining forfeiture funds be used to reduce employer contributions.

---

[4] Under Section 7.05 of the Plan Document, a terminated employee who resumes employment with an entity for which the Plan provides benefits within five (5) years has the right to have his or her account balance restored.

43.    In particular, Section 7.04 of the Plan Document provides, in relevant part, as follows:

> Application of Forfeitures.  **To the extent not used in the Plan Year to restore Participants' Accounts** pursuant to Section 7.05 **or to pay expenses** in accordance with Section 16.10, the Plan Administrator shall apply Forfeitures to reduce Company contributions due for the Plan Year in which they arise. Any Forfeitures in excess of the amounts applied to reduce Company contributions and to restore Participants' Accounts in such Plan Year shall be carried forward to restore Participants' Accounts, to reduce Company contributions and to pay Plan expenses in accordance with Section 16.10. . . .

Plan Document § 7.04 (emphases added).

44.    The Plan Document's current Section 7.04 is nearly identical to an earlier version of the Plan Document, a restatement effective as of January 1, 2015 (the "January 2015 Plan Restatement"), except "Plan Administrator" now takes the place of "Administrative Committee," and "Section 16.10" now takes the place of "Section 16.11." Thus, the same restriction requiring forfeitures to be used first to pay Plan expenses before reducing employer contributions has been in effect for at least ten (10) years.

45.    Accordingly, at all relevant times, for each Plan Year, Defendants were obligated by the express terms of the Plan Document to use Plan forfeitures incurred in that Plan Year either (1) "to restore Participants' Accounts in accordance with Section 7.05," *or* (2) "to pay expenses in accordance with Section 16.10."  Plan Document § 7.04. *Only if*, after using the Plan's forfeiture assets to reinstate reemployed participants' accounts within a given Plan Year, and then using the remainder to pay down Plan expenses during that Plan Year, assets remained, were Defendants permitted to use any remainder "to reduce [NG's] contributions due for the Plan Year in which they arise." *Id.*  As with any Plan assets, NG has and had a continuing duty to monitor and administer them in accordance with the Plan and ERISA.

46.     Between 2018 and 2023, inclusive, over 20,000 Plan participants terminated their employment with NG with accrued benefits that were less than 100% vested. Thus, an average of approximately 3,450 participants left NG's employ each year between 2018 and 2023, inclusive, with accrued benefits that were not 100% vested. Nevertheless, all of these participants remained, and today remain, active Plan participants in the Plan.

### III.    The Terms of the Plan and Defendants' Unauthorized Use of Plan Forfeiture Assets

47.     Since at least January 1, 2015, and continuing to the present, the Plan Document has given no discretion to the Plan's fiduciaries with respect to the use of Plan forfeiture assets. Plan forfeiture assets must be, and at all relevant times were required to be used, *first*, to restore reinstated employees' unvested balances to the extent those participants are rehired within five years of their termination date; *second*, to pay plan administrative expenses; and, *third*, only if there is or was any remainder in a given Plan Year, to reduce NG's own matching contributions. Furthermore, Defendants are and at all relevant times were obligated by Section 7.05 of the Plan Document to keep a sufficient reserve of Plan forfeiture assets on the relevant balance sheet for at least five years following a participant's separation from employment to account for the possibility that such a participant may become rehired.

48.     In direct violation of these terms of the Plan Document, and of ERISA, during the entire Class Period of six years, Defendants used ***all*** Plan forfeiture assets accrued in ***every Plan Year*** to reduce NG's employer matching contributions instead of paying Plan administrative expenses. None of the forfeiture funds were used to pay Plan expenses.

49.     In its Form 5500 filed with DOL for the Plan Year ending on December 31, 2019, NG represented that "[f]orfeited amounts may be used to reduce [NG's] matching contributions or to offset Plan expenses." NG reported that, as of December 31, 2019, the Plan held $12.6 million

in its forfeiture account. For 2019, NG reported that it used *all* of the $12.6 million in the forfeiture account to reduce the amount of NG's matching employer contributions, and that NG did not use any forfeitures to offset Plan expenses during the 2019 Plan Year. As a result, by using all of the assets in the forfeiture account in 2019 to reduce NG's matching contribution obligations, Defendants violated ERISA by violating the Plan Document, including Section 7.04 thereof. Defendants also did not comply with the Plan Document's requirement that forfeited assets must be held for a period of at least five years following the termination of a participant's employment before NG may use them for any other purpose.

50.    In 2019, Defendants represented that they used *all* of the $12.6 million in the forfeiture account to reduce NG's matching employer contributions. Defendants also reported in the same DOL filing that Plan participants were charged an allocation of the Plan's administrative expenses in the amount of $11,051,222.

51.    Defendants reported $11,051,222 in administrative expenses for 2019. Had Defendants complied with the Plan Document, Defendants would have used the Plan's forfeiture assets in 2019 to pay the Plan's administrative expenses in full, at no cost to the participants. But Defendants did not comply with the Plan Document. Instead, Defendants took *all* of the Plan's forfeiture funds for their own benefit and, as a result, participants' retirement assets were depleted by $11,051,222 in 2019 alone.

52.    In its Form 5500 filed with DOL for the Plan Year ending on December 31, 2020, NG represented that "[f]orfeited amounts may be used to reduce [NG's] matching contributions or to offset Plan expenses." NG reported that, as of December 31, 2020, the Plan held $13.0 million in its forfeiture account. For 2020, NG reported that it used *all* of the $13.0 million in the forfeiture account to reduce NG's matching employer contributions, and that NG did not use any forfeitures

19

to offset Plan expenses during the 2020 Plan Year. As a result, by using all of the assets in the forfeiture account in 2020 to reduce NG's matching contribution obligations, Defendants violated ERISA by violating the Plan Document, including Section 7.04 thereof. Defendants also did not comply with the Plan Document's requirement that forfeited assets must be held for a period of at least five years following the termination of a participant's employment before NG may use them for any other purpose.

53.     In 2020, Defendants represented that they used *all* of the $13.0 million in the forfeiture account to reduce NG's matching employer contributions. Defendants also reported in the same DOL filing that Plan participants were charged an allocation of the Plan's administrative expenses in the amount of $10,996,371.

54.     Defendants reported $10,996,371 in administrative expenses for 2020. Had Defendants complied with the Plan Document, Defendants would have used the Plan's forfeiture assets in 2020 to pay the Plan's administrative expenses in full, at no cost to the participants. But Defendants did not comply with the Plan Document. Instead, Defendants took *all* of the Plan's forfeiture funds for their own benefit and, as a result, participants' retirement assets were depleted by $10,996,371 in 2020 alone.

55.     In its Form 5500 filed with DOL for the Plan Year ending on December 31, 2021, NG represented that "[f]orfeited amounts may be used to reduce [NG's] contributions or to offset Plan expenses." NG reported that, as of December 31, 2021, the Plan held $20.5 million in its forfeiture account. For 2021, NG reported that it used *all* of the $20.5 million in the forfeiture account to reduce NG's matching employer contributions, and that NG did not use any forfeitures to offset Plan expenses during the 2021 Plan Year. As a result, by using all of the assets in the forfeiture account in 2021 to reduce NG's matching contribution obligations, Defendants violated

ERISA by violating the Plan Document, including Section 7.04 thereof. Defendants also did not comply with the Plan Document's requirement that forfeited assets must be held for a period of at least five years following the termination of a participant's employment before NG may use them for any other purpose.

56.     In 2021, Defendants represented that they used *all* of the $20.5 million in the forfeiture account to reduce NG's matching employer contributions. Defendants also reported in the same DOL filing that Plan participants were charged an allocation of the Plan's administrative expenses in the amount of $12,324,805.

57.     Defendants reported $12,324,805 in administrative expenses for 2021. Had Defendants complied with the Plan Document, Defendants would have used the Plan's forfeiture assets in 2021 to pay the Plan's administrative expenses in full, at no cost to the participants. But Defendants did not comply with the Plan Document. Instead, Defendants took *all* of the Plan's forfeiture funds for their own benefit and, as a result, participants' retirement assets were depleted by $12,324,805 in 2021 alone.

58.     In its Form 5500 filed with DOL for the Plan Year ending on December 31, 2022, NG represented that "[f]orfeited amounts may be used to reduce [NG's] contributions or to offset Plan expenses." NG reported that, as of December 31, 2022, the Plan held $18.9 million in its forfeiture account. For 2022, NG reported that it used *all* of the $18.9 million in the forfeiture account to reduce NG's matching employer contributions, and that NG did not use any forfeitures to offset Plan expenses during the 2022 Plan Year. As a result, by using all of the assets in the forfeiture account in 2022 to reduce NG's matching contribution obligations, Defendants violated ERISA by violating the Plan Document, including Section 7.04 thereof. Defendants also did not comply with the Plan Document's requirement that forfeited assets must be held for a period of at

least five years following the termination of a participant's employment before NG may use them for any other purpose.

59.     In 2022, Defendants represented that they used *all* of the $18.9 million in the forfeiture account to reduce NG's matching employer contributions. Defendants also reported in the same DOL filing that Plan participants were charged an allocation of the Plan's administrative expenses in the amount of $11,487,575.

60.     Defendants reported $11,487,575 in administrative expenses for 2022. Had Defendants complied with the Plan Document, Defendants would have used the Plan's forfeiture assets in 2022 to pay the Plan's administrative expenses in full, at no cost to the participants. But Defendants did not comply with the Plan Document. Instead, Defendants took *all* of the Plan's forfeiture funds for their own benefit and, as a result, participants' retirement assets were depleted by $11,487,575 in 2022 alone.

61.     In its Form 5500 filed with DOL for the Plan Year ending on December 31, 2023, NG represented that "[f]orfeited amounts may be used to reduce [NG's] contributions or to offset Plan expenses." NG reported that, as of December 31, 2023, the Plan held $5.8 million in its forfeiture account. For 2023, NG reported that its "employer contributions were reduced by $16.5 million due to forfeitures," and that NG did not use any forfeitures to offset Plan expenses during the 2023 Plan Year. As a result, by using all of the assets in the forfeiture account in 2023 to reduce NG's matching contribution obligations, NG violated ERISA by violating the Plan Document, including Section 7.04 thereof. Defendants also did not comply with the Plan Document's requirement that forfeited assets must be held for a period of at least five years following the termination of a participant's employment before NG may use them for any other purpose.

62.    In 2023, Defendants represented that they used *all* of the $5.8 million in the forfeiture account to reduce NG's matching employer contributions. Defendants also reported in the same DOL filing that Plan participants were charged an allocation of the Plan's administrative expenses in the amount of $11,512,500.

63.    Defendants should have used the Plan's forfeiture assets in 2023 to pay the Plan's administrative expenses, and the combination of $16.5 million and the $5.8 million in forfeiture assets was more than enough to eliminate any expenses in 2023 for participants.

64.    As of the date of this filing, Defendants have not filed a Form 5500 for the Plan with DOL for the Plan Year ending on December 31, 2024. Nevertheless, Defendants as of this date continue to use the Plan's forfeiture assets unlawfully, imprudently, and disloyally, all in contravention of the Plan Document and ERISA.

65.    In sum:

| Year | Forfeiture Assets Available to Plan | Forfeiture Assets Used to Reduce NG's Mandatory Matching Contributions | Administrative Expenses Owed by Plan | Administrative Expenses Paid by NG | Administrative Expenses Paid by Participants | Forfeiture Assets Held in Escrow |
|---|---|---|---|---|---|---|
| 2019 | $12.6 M | $12.6 M (100%) | $11,051,222 | $0 (0%) | $11,051,222 (100%) | $0 (0%) |
| 2020 | $13.0 M | $13.0 M (100%) | $10,996,371 | $0 (or 0%) | $10,996,371 (100%) | $0 (0%) |
| 2021 | $20.5 M | $20.5 M (100%) | $12,324,805 | $0 (0%) | $12,324,805 (100%) | $0 (0%) |
| 2022 | $18.9 M | $18.9 M (100%) | $11,487,575 | $0 (0%) | $11,487,575 (100%) | $0 (0%) |
| 2023 | $5.8 M | $5.8 M (100%) | $11,512,500 | $0 (0%) | $11,512,500 (100%) | $0 (0%) |
| **Total** | **$70.8 M** | **$70.8 M (100%)** | **$57,372,473** | **$0 (0%)** | **$57,372,473 (100%)** | **$0 (0%)** |

**IV.    Description of Administrative Expenses Improperly Charged to Participants While Defendants Reduced Their Own Contributions to the Plan**

66.    Throughout the Class Period, in direct contravention of the express terms of the Plan and of ERISA, Defendants continued to act disloyally and imprudently by using Plan forfeiture assets to reduce NG's required employer matching contribution obligations, rather than using those Plan assets to pay for administrative expenses charged to Plan participant accounts. In addition, throughout the Class Period, Defendants continued to act disloyally and imprudently by continuing to violate the Plan Document's requirement to hold in escrow for five years all forfeiture assets derived from employment terminations.

67.    The administrative expenses unlawfully charged to Plan participants' accounts throughout the Class Period included fees for administrative services such as recordkeeping services, withdrawal fees, loan maintenance fees, loan set up fees, and managed account services. If Defendants had followed the mandatory terms of the Plan, Plan participants would not have been improperly charged these administrative fees.

68.    The Summary Plan Description for July 2024 (the "July 2024 SPD") makes clear that Plaintiffs paid these administrative fees. In relevant part, the SPD states:

> **Plan Fees**
> Savings Plan participants share the cost of operating the Savings Plan, including taxes and expenses. These administrative fees are deducted proportionately from your core investment funds and earnings. The expense ratio appears in the annual fee disclosure notice available on NetBenefits, and additional investment information is available on NetBenefits or by calling the NGBC.
>
> Plan expenses include fees for services such as trustee, investment management and research, legal and consulting, accounting, recordkeeping, auditing, and employee communications and assistance. . . .

July 2024 SPD, at 107.

69.    Further, only a small number of the administrative fees charged to participants are disclosed in their account statements. Defendants do not disclose the millions of dollars that are paid by participants in their account statements that were used to pay administrative fees.

70.    For example, for the period between February 23, 2022, and February 14, 2025, Mr. Winkler was charged a $50.00 administrative fee, despite having left NG's employ in 2024. According to statements issued by the Plan, "[s]ome of the administrative services performed for the Plan were underwritten from the total operating expenses of the Plan's investment options."

71.    Although Plaintiff Winkler provides examples of the unlawful administrative fees charged to his account, the total administrative fees charged to thousands of Plan participants were substantial, as discussed hereinabove.

72.    In addition to these administrative fees improperly paid from Plan assets from 2019 through 2023, inclusive, and continuing into the present, Plan participants incurred and are incurring additional administrative expenses such as Plan recordkeeping fees, trustee fees, fees for qualified domestic relations orders, legal fees, brokerage account fees, consultant fees, audit fees, mailing fees, and printing fees.

73.    For Plan Year 2019, Defendants, by way of allocating charges to Plaintiffs' individual accounts, caused the following Plan providers to be paid the following sums for Plan-related administrative services notwithstanding that ample forfeiture funds were available, thereby unlawfully, impudently, and disloyally causing Plaintiffs to incur very substantial losses of their retirement assets:

a.    Plaintiffs paid **Strategic Advisors, Inc.** the sum of $3,844,187 for advisory services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

b.  Plaintiffs paid **Fidelity Investments Institutional** the sum of $3,804,809 for recordkeeping services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

c.  Plaintiffs paid **State Street Bank and Trust Company** the sum of $461,867 for direct trustee services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

d.  Plaintiffs paid **Anacomp Inc.** the sum of $333,583 for computer services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

e.  Plaintiffs paid **Deloitte & Touche LLP** the sum of $224,285 for auditing services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

f.  Plaintiffs paid **Chipton-Ross Inc.** the sum of $118,797 for contract labor services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

g.  Plaintiffs paid **Callan Associates** the sum of $73,532 for consulting services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

h.  Plaintiffs paid **OSI Consulting Inc.** the sum of $47,441 for consulting services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

i.  Plaintiffs paid **Willis Towers Watson Delaware Inc.** the sum of $46,170 for consulting services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

26

j.  Plaintiffs paid **Seyfarth Shaw LLP** the sum of $37,435 for legal services in 2019, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

k.  Plaintiffs paid **ePlus Technology Inc.** the sum of $33,061 for information technology hardware services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

l.  Plaintiffs paid **JTK Group LLC** the sum of $19,001 for consulting services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

m.  Plaintiffs paid **Homes Lowry Horn & Johnson Ltd.** the sum of $18,303 for Form 5500 preparation services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

n.  Plaintiffs paid **Open Text, Inc.** the sum of $17,244 for computer services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

o.  Plaintiffs paid **Global Trading Analytics LLC** the sum of $15,646 for consulting services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

p.  Plaintiffs paid **CDW Direct LLC** the sum of $14,403 for computer services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full;

q.  Plaintiffs paid **KES Mail Inc.** the sum of $12,733 for commercial services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full; and

r.  Plaintiffs paid **Ropes and Gray LLP** the sum of $6,818 for legal services, even though the Plan had sufficient forfeiture assets in 2019 to pay this fee in full.

74.    For Plan Year 2020, Defendants, by way of allocating charges to Plaintiffs' individual accounts, caused the following Plan providers to be paid the following sums for Plan-

related administrative services notwithstanding that ample forfeiture funds were available, thereby unlawfully, impudently, and disloyally causing Plaintiffs to incur very substantial losses of their retirement assets:

 a. Plaintiffs paid **Fidelity Investments Institutional** the sum of $4,565,927 for recordkeeping services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

 b. Plaintiffs paid **Strategic Advisors, Inc.** the sum of $4,502,319 for advisory services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

 c. Plaintiffs paid **State Street Bank and Trust Company** the sum of $370,975 for directed trustee services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

 d. Plaintiffs paid **Deloitte & Touche LLP** the sum of $195,488 for auditing services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

 e. Plaintiffs paid **Chipton-Ross Inc.** the sum of $96,020 for consulting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

 f. Plaintiffs paid **Callan Associates** the sum of $58,856 for consulting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

g.  Plaintiffs paid **Willis Towers Watson Delaware Inc.** the sum of $34,290 for consulting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

h.  Plaintiffs paid **Seyfarth Shaw LLP** the sum of $26,581 for legal services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

i.  Plaintiffs paid **Homes Lowry Horn & Johnson Ltd.** the sum of $18,850 for Form 5500 preparation services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

j.  Plaintiffs paid **ePlus Technology Inc.** the sum of $13,632 for information technology hardware services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

k.  Plaintiffs paid **Global Trading Analytics LLC** the sum of $12,562 for consulting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

l.  Plaintiffs paid **OSI Digital Inc.** the sum of $9,568 for consulting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

m.  Plaintiffs paid **PKF O'Connor Davies LLP** the sum of $8,860 for accounting services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full;

n.  Plaintiffs paid **Open Text, Inc.** the sum of $5,927 for computer services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full; and

o. Plaintiffs paid **KES Mail Inc.** the sum of $5,861 for commercial services in 2020, even though the Plan had sufficient forfeiture assets in 2020 to pay this fee in full.

75. For Plan Year 2021, Defendants, by way of allocating charges to Plaintiffs' individual accounts, caused the following Plan providers to be paid the following sums for Plan-related administrative services notwithstanding that ample forfeiture funds were available, thereby unlawfully, impudently, and disloyally causing Plaintiffs to incur very substantial losses of their retirement assets:

a. Plaintiffs paid **Strategic Advisors, Inc.** the sum of $5,201,963 for advisory services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

b. Plaintiffs paid **Fidelity Investments Institutional** the sum of $5,089,766 for recordkeeping services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

c. Plaintiffs paid **State Street Bank and Trust Company** the sum of $371,409 for directed trustee services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

d. Plaintiffs paid **Deloitte & Touche LLP** the sum of $195,609 for auditing services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

e. Plaintiffs paid **Chipton-Ross, Inc.** the sum of $85,563 for consulting services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

f.  Plaintiffs paid **Callan Associates** the sum of $44,179 for consulting services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

g.  Plaintiffs paid **OSI Digital Inc.** the sum of $42,037 for consulting services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

h.  Because of Defendants' unlawful conduct, Plaintiffs paid **Citrin Cooperman Advisors LLC** the sum of $19,198 for Form 5500 preparation services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

i.  Plaintiffs paid **ePlus Technology Inc.** the sum of $13,363 for information technology hardware services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

j.  Plaintiffs paid **Dell Marketing LP** the sum of $11,934 for computer hardware services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

k.  Plaintiffs paid **Global Trading Analytics LLC** the sum of $9,443 for consulting services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full;

l.  Plaintiffs paid **JTK Group LLC** the sum of $6,327 for consulting services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full; and

m.  Plaintiffs paid **Open Text, Inc.** the sum of $6,105 for computer services in 2021, even though the Plan had sufficient forfeiture assets in 2021 to pay this fee in full.

76.     For Plan Year 2022, Defendants, by way of allocating charges to Plaintiffs' individual accounts, caused the following Plan providers to be paid the following sums for Plan-related administrative services notwithstanding that ample forfeiture funds were available, thereby unlawfully, impudently, and disloyally causing Plaintiffs to incur very substantial losses of their retirement assets:

   a.   Plaintiffs paid **Fidelity Investments Institutional** the sum of $4,937,295 for recordkeeping services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

   b.   Plaintiffs paid **Strategic Advisors, Inc.** the sum of $4,835,901 for advisory services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

   c.   Plaintiffs paid **State Street Bank and Trust Company** the sum of $373,716 for directed trustee services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

   d.   Plaintiffs paid **Deloitte & Touche LLP** the sum of $201,374 for auditing services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

   e.   Plaintiffs paid **Chipton-Ross Inc.** the sum of $95,076 for consulting services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

   f.   Plaintiffs paid **Callan Associates** the sum of $58,964 for consulting services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

g.  Plaintiffs paid **OSI Digital Inc.** the sum of $47,418 for consulting services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

h.  Plaintiffs paid **Harter Secrest and Emery LLP** the sum of $23,648 for legal services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

i.  Plaintiffs paid **Citrin Cooperman Advisors LLC** the sum of $19.780 for Form 5500 preparation services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

j.  Plaintiffs paid **Global Trading Analytics LLC** the sum of $9,454 for consulting services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full;

k.  Plaintiffs paid **Open Text, Inc.** the sum of $6,410 for computer services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full; and

l.  , Plaintiffs paid **JTK Group LLC** the sum of $6,013 for consulting services in 2022, even though the Plan had sufficient forfeiture assets in 2022 to pay this fee in full.

77.  For Plan Year 2023, Defendants, by way of allocating charges to Plaintiffs' individual accounts, caused the following Plan providers to be paid the following sums for Plan-related administrative services notwithstanding that ample forfeiture funds were available, thereby unlawfully, impudently, and disloyally causing Plaintiffs to incur very substantial losses of their retirement assets:

a.  Plaintiffs paid **Fidelity Investments Institutional** the sum of $2,208,502 for recordkeeping services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

b.  Plaintiffs paid **State Street Bank and Trust Company** the sum of $278,874 for directed trustee services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

c.  Plaintiffs paid **Deloitte & Touche LLP** the sum of $206,980 for auditing services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

d.  Plaintiffs paid **Callan Associates** the sum of $110,735 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

e.  Plaintiffs paid **Chipton-Ross Inc.** the sum of $104,264 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

f.  Plaintiffs paid **OSI Digital Inc.** the sum of $49,522 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

g.  Plaintiffs paid **HerronPalmer LLC** the sum of $48,455 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

h.  Plaintiffs paid **Citrin Cooperman Advisors LLC** the sum of $37,561 for Form 5500 preparation services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

i. Plaintiffs paid **Future Tech Enterprise, Inc.** the sum of $27,866 for "other" services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

j. Plaintiffs paid **Global Trading Analytics LLC** the sum of $9,468 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

k. Plaintiffs paid **Open Text, Inc.** the sum of $7,316 for computer services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

l. Because of Defendants' unlawful conduct, Plaintiffs paid **PKF O'Connor Davies LLP** the sum of $5,800 for "accountant/auditor" services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full;

m. Plaintiffs paid **Carahsoft Technology Corporation** the sum of $5,263 for information technology hardware services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full; and

n. Plaintiffs paid **JTK Group LLC** the sum of $5,068 for consulting services in 2023, even though the Plan had sufficient forfeiture assets in 2023 to pay this fee in full.

78. In violation of their duty to act for the exclusive benefit of Plan participants, Defendants used Plan forfeiture assets to reduce NG's employer matching contribution obligations between 2019 and 2023, and continuing into the present. This practice has greatly harmed the Plan, along with its participants and beneficiaries, and resulted and continues to result in an improper benefit to NG.

79. Under the terms of the Plan, Defendants did not and do not have the right to use forfeiture assets to reduce NG's contributions before Plan administrative expenses are paid.

80.     Moreover, under the terms of the Plan, Defendants did not have the right to use the Plan's available forfeiture assets to reduce NG's mandatory matching contributions in 2019 through 2023, and continuing into the present because, in those years, none of the Plan's forfeiture assets had been existence for at least five years. Despite the express terms of the Plan, Defendants disloyally and imprudently benefited themselves by continuously using Plan forfeiture assets to reduce NG's required employer matching contribution obligations, rather than holding those Plan assets in escrow for a period of at least five years following a participant's termination from employment.

## CLASS ACTION ALLEGATIONS

81.     Section 502(a)(2) of ERISA (29 U.S.C. § 1132(a)(2)) authorizes any participant or beneficiary of an ERISA plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan pursuant to 29 U.S.C. § 1109(a).

82.     Acting in this representative capacity, and to safeguard the Plan's unnamed participants' and beneficiaries' substantive and procedural due process rights, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs bring this action as a class action pursuant to Rule 23(a) and Rule 23(b)(1) of the Federal Rules of Civil Procedure or, alternatively, pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

83.     Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

>       All participants and beneficiaries of the Northrop Grumman Savings Plan from May 2, 2019, through the date of judgment (the "Class Period"), excluding, the Defendants, including but not limited to the officers and

directors of Northrop Grumman Corporation from April 25, 2019 through the date of judgment and the individual members of the Northrop Grumman Benefit Plan Administrative Committee from April 25, 2019 through the date of judgment.

84.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    ***Numerosity***. The Class includes more than 100,000 members and is so large that joinder of all its members is impracticable.

b.    ***Commonality.*** There are questions of law and fact common to the class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their duty to follow the terms of the Plan Document; whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the fiduciaries engaged in prohibited transactions with Plan assets; whether the fiduciaries violated ERISA's anti-inurement provision by using Plan assets for their own benefit; whether fiduciaries of the Plan failed to monitor the actions of Plan fiduciaries; the amount of losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty and other unlawful conduct alleged herein.

c.    ***Typicality.*** Plaintiffs' claims are typical of the claims of the class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

     d.     ***Adequacy of Class Representation by Named Plaintiffs.*** Plaintiffs are adequate representatives of the class because they were participants in the Plan during the class period, have no interest that is in conflict with any other member of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

     e.     ***Risks of Individual Adjudications.*** Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

85.     ***Superiority & Predominance.*** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of

this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

86.    ***Manageability & Adequacy of Class Counsel.*** Plaintiffs' lead counsel, Schlichter Bogard LLC (the "Firm"), will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g).

    a.   *Schlichter Bogard pioneered the field of ERISA 401(k) excessive fee litigation.* The Firm has been widely recognized by many federal judges across the United States, as well as by national media across the country as having literally created the field of ERISA excessive fee litigation. The Firm has vast experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions alleging excessive fees in 401(k) and 403(b) cases.

    b.   Dating back to 2006, when the Firm filed the first cases in the country alleging excessive fees in 401(k) plans, the Firm has a proven track record of vigorously pursuing the rights of ERISA plan participants. The Firm was the first to try an ERISA excessive fee case and successfully obtain a judgment on behalf of plan participants. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012). After multiple appeals to the Eighth Circuit and remands to the district court, and over 25,000 hours of attorney and paralegal time, the parties ultimately settled the action in 2019, almost 14 years after filing. *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880, at *4 (W.D. Mo. Aug. 16, 2019).

    c.   *Tibble v. Edison International* is a landmark ERISA case handled by the Firm. After a partial loss in the U.S. District Court for the Central District of California, which

was upheld by the U.S. Court of Appeals for the Ninth Circuit, the Firm achieved a reversal before the Supreme Court of the United States in the first-ever 401(k) excessive fee case for which a writ of *certiorari* was granted. The Supreme Court's vacatur in favor of the plaintiffs was unanimous. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).

d.   The Firm also filed the first-in-the-nation 403(b) excessive fee cases against large universities. 403(b) plans are similar to 401(k) plans, but are available for nonprofit institutions. However, the same fiduciary duties under ERISA apply to 403(b) plans, and the same law applies.

e.   The Firm was also the first in the United States to try a 403(b) case.

f.   Moreover, the Firm was the first to receive a writ of *certiorari* from the Supreme Court. *See Hughes v. Nw. Univ.*, 595 U.S. 170 (2022). In that case, the Firm also secured a reversal of a dismissal before the Supreme Court, again in a unanimous decision. *See id.*

g.   Further, the Firm sought review of a dismissal of another 403(b) case before the Supreme Court of the United States. In that case—only the third 401(k) or 403(b) case ever taken by the Supreme Court (the other two shown above), the Firm again achieved a victory, securing reversal of a dismissal. *See Cunningham v. Cornell Univ.*, No. 23-1007, —S. Ct.—, 2025 WL 1128943, 2025 U.S. LEXIS 1458 (Apr. 17, 2025). Once again, in that very recent case, the Supreme Court's favorable decision for the plaintiffs represented by the Firm was unanimous. *See id.*

h.   The Firm's efforts and successful outcomes have been recognized by federal judges across the United States as having "led to enormous fee savings for plan

participants." *Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-GBD, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (noting that undersigned counsel's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees") (citation omitted). With these efforts, the Firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012); *see also Will v. Gen. Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *9 (S.D. Ill. Nov. 22, 2010);

i.   The Firm's pioneering and successful work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, NN.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1,

2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

87.    The Firm has settled 32 ERISA fiduciary breach class actions involving 401(k) and 403(b) defined contribution plans—like the Plan at issue in this action. Collectively, the Firm has recovered $705,875,000 across these 32 settlements alone and, in each of those cases, the Firm was appointed as Class Counsel. The foregoing monetary figure does not account for the valuable non-monetary relief that has been prominent in most of those settlements. The number of objectors to these settlements has been miniscule, and in some cases of thousands of class members, zero. Below are some of the 32 settlements borne of the Firm's efforts in similar cases:

| **Matter** | **Timely Objectors** | **Monetary Settlement** |
|---|---|---|
| *Clark v. Duke Univ.*, No. 16-1044, 2019 U.S. Dist. LEXIS 105696 (M.D.N.C. June 24, 2019). | 0 | $10,650,000 |
| *Krueger v. Ameriprise Fin., Inc*., No. 11-2781, 2015 U.S. Dist. LEXIS 91385 (D. Minn. July 13, 2015). | 0 | $27,500,000 |
| *Sims v. BB&T Corp.*, No. 15-732, 2019 U.S. Dist. LEXIS 75839 (M.D.N.C. May 6, 2019). | 0 | $24,000,000 |
| *Kruger v. Novant Health, Inc*., No. 14-208, 2016 U.S. Dist. LEXIS 193107 (M.D.N.C. Sep. 29, 2016). | 0 | $32,000,000 |
| *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-6213, 2017 U.S. Dist. LEXIS 223293 (C.D. Cal. Oct. 24, 2017). | 4 (0.000018 of all Plan Participants) | $16,750,000 |
| *Marshall v. Northrop Grumman Corp.*, No. 16-6794, 2020 U.S. Dist. LEXIS 177056 (C.D. Cal. Sep. 18, 2020). | 5 (0.00004 of all Plan Participants) | $12,375,000 |
| *Will v. Gen. Dynamics Corp*., No. 06-698, 2010 U.S. Dist. LEXIS 123349 (S.D. Ill. Nov. 22, 2010) . | 6 (0.00004 of all Plan Participants) | $15,150,000 |

| Matter | Timely Objectors | Monetary Settlement |
|---|---|---|
| *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880 (W.D. Mo. Aug. 16, 2019). | 0 | $55,000,000 |
| *Munro v. Univ. of S. Cal.*, No. 16-6191, Doc. [384] (C.D. Cal. Aug. 24, 2023). | 1 | $13,050,000 |
| *Kanawi v. Bechtel Corp.*, No. 06-5566, Doc. [828] (N.D. Cal. Mar. 1, 2011). | 9 (0.00021 of all Plan Participants) | $18,500,000 |
| *Spano v. Boeing Co.*, No. 06-743, 2016 U.S. Dist. LEXIS 161078 (S.D. Ill. Mar. 31, 2016). | 10 (0.00044 of all Plan Participants) | $57,000,000 |
| *Martin v. Caterpillar Inc.*, No. 07-1009, 2010 U.S. Dist. LEXIS 145111 (C.D. Ill. Sep. 9, 2010). | 2 | $16,500,000 |
| *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622 (C.D. Ill. Oct. 15, 2013). | 1 | $35,000,000 |
| *Pledger v. Reliance Tr. Co.*, No. 15-4444, 2021 U.S. Dist. LEXIS 105868 (N.D. Ga. Mar. 8, 2021). | 0 | $39,800,000 |
| *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2021 U.S. Dist. LEXIS 200890 (S.D.N.Y. Oct. 18, 2021); *Cates*, Doc. [443-1] (S.D.N.Y.) (filed May 21, 2021). | 1 | $13,000,000 |
| *Wachala v. Astellas US LLC*, No. 20-3882, Doc. [241] (N.D. Ill. Nov. 2, 2023); *Wachala*, Doc. [225-1] (N.D. Ill.) (filed June 23, 2023). | 0 | $9,500,000 |
| *Tracey v. Mass. Inst. of Tech.* No. 16-11620, Doc. [317] (D. Mass. May 29, 2020); *Tracey*, Doc. [290-1] (D. Mass.) (filed Oct. 28, 2019). | 1 | $18,100,000 |
| *Ford v. Takeda Pharm. U.S.A., Inc.*, No. 21-10090, 2023 U.S. Dist. LEXIS 93286 (D. Mass. Mar. 31, 2023). | 1 | $22,000,000 |

88.     The Firm also has devoted, and continues to devote, very substantial attorney hours to ensure the best results for its clients. The Firm has devoted over 320,000 attorney hours collectively to its settled 401(k) matters alone. For the Firm's settled 403(b) matters, it has devoted over 56,000 attorney hours to date. Below is a representative list of the Firm's settled 401(k) and

403(b) settled matters, quantifying the Firm's dedication among both its attorneys and its professional and paraprofessional staff:

| Matter | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622 (C.D. Ill. Oct. 15, 2013). | 33,000+ | 3,000+ |
| *Wachala v. Astellas US LLC*, No. 20-3882, Doc. [233-2] (N.D. Ill.) (filed Sept. 1, 2023). | 9,385.40 | 2,341.30 |
| *Will v. Gen. Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349 (S.D. Ill. Nov. 22, 2010). | 10,000+ | 1,850+ |
| *Munro v. Univ. of S. Cal.*, No. 16-6191, Doc. [384] (C.D. Cal. Aug. 24, 2023). | 13,285.20 | 1,393.30 |
| *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2021 U.S. Dist. LEXIS 200890 (S.D.N.Y. Oct. 18, 2021). | 13,188 | 2,288 |
| *Spano v. Boeing Co.*, No. 06-743, 2016 U.S. Dist. LEXIS 161078 (S.D. Ill. Mar. 31, 2016). | 21,986.80 | 4,828.20 |
| *Sims v. BB&T Corp.*, No. 15-732, 2019 U.S. Dist. LEXIS 75839 (M.D.N.C. May 6, 2019). | 14,605.70 | 1,951.70 |
| *Pledger v. Reliance Tr. Co.*, No. 15-4444, Doc. [289-4] (N.D. Ga.) (filed Jan. 4, 2021). | 15,996.20 | 2 ,001.70 |
| *Clark v. Duke Univ.*, No. 16-1044, 2019 U.S. Dist. LEXIS 105696 (M.D.N.C. June 24, 2019). | 7,841.60 | 661.30 |
| *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037 (S.D. Ill. Jan. 31, 2014). | ~18,000 | 4,000+ |
| *George v. Kraft Foods Glob., Inc.,* No. 08-3799, 2012 U.S. Dist. LEXIS 166816 (N.D. Ill. June 26, 2012). | 19,600 | 4,500 |
| *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206 (S.D. Ill. July 17, 2015). | 20,124 | 4,960 |
| *Kanawi v. Bechtel Corp.*, No. 06-5566, Doc. [805-5] at 4 (N.D. Cal.) (filed Dec. 20, 2010); Doc. [828] at 4 (N.D. Cal.)(filed March 1, 2011). | 21,850.22 | 4,075.54 |
| *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-6213, Doc. [783-5] at 3 (C.D. Cal.) (filed Aug. 24, 2017); Doc. [803] at 5 (C.D. Cal.) (filed Oct. 24, 2017). | 23,498 | 2,999.70 |

| **Matter** | **Attorney Hours** | **Non-Attorney Hours** |
|---|---|---|
| *Marshall v. Northrop Grumman Corp.,* No. 16-6794, Doc. [331-4] at 3 (C.D. Cal.) (filed April 6, 2020); Doc. [378] at 5 (C.D. Cal.) (filed Sept. 18, 2020). | 7,497 | 1,118.40 |
| *Tussey v. ABB, Inc.*, No. 06-4305, Doc. [864-2] (W.D. Mo.) (filed June 14, 2019). | 24,449.90 | 4,304,30 |
| *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2015 U.S. Dist. LEXIS 91385 (D. Minn. July 13, 2015). | 27,991 | 2,716 |
| *Tracey v. Massachusetts Inst. of Tech.* No. 16-11620, Doc. [302-3] (D. Mass.) (filed Mar. 27, 2020). | 9,094.60 | 1490.40 |

89.     Since 2006, the Firm has had a team of attorneys, professional, and paraprofessional staff dedicated to ERISA excessive fee litigation, and this remains the case to this day.

90.     DOL, mandated by statute to regulate 401(k) and 403(b) cases, has weighed in supporting the Firm's clients with *amicus curiae* briefing in numerous cases. In all three Supreme Court cases handled by the Firm, DOL, through the Solicitor General of the United States, has supported the Firm's position with *amicus curiae* briefs. In addition, DOL has supported the Firm as *amicus curiae* in 401(k) and 403(b) excessive fee cases before the U.S. Courts of Appeals for the Second, Third, Seventh, Eighth, Ninth, and Eleventh Circuit Courts of Appeals:

a.     *Hecker v. Deere & Co.*, 556 F.3d 575, 581 (7th Cir. 2009).

b.     *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011).

c.     *Spano v. Boeing Co.*, 633 F.3d 574, 585–86 (7th Cir. 2011).

d.     *Renfro v. Unisys Corp.*, 671 F.3d 314, 328 (3d Cir. 2011).

e.     *Tibble v. Edison Int'l*, 711 F.3d 1061, 1070–71 (9th Cir. 2013), *vacated and remanded*, 575 U.S. 523 (2015).

      f.    *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014).

      g.    *Vellali v. Yale Univ.*, No. 23-1082 (2d Cir. docketed July 25, 2023), Doc. 82 (filed Dec. 19, 2023).

      h.    *Bolton v. Inland Fresh Seafood Corp.*, No. 24-10084 (11th Cir. docketed Jan. 4, 2024), Doc. 32 (filed May 24, 2024).

91.    In the three Supreme Court victorious cases (which are the only three 401(k) and 403(b) excessive fee cases for which the Supreme Court ever has granted *certiorari*), DOL supported the Firm as *amicus curiae*:

      a.    *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

      b.    *Hughes v. Nw. Univ.*, 595 U.S. 170 (2022).

      c.    *Cunningham v. Cornell Univ.*, No. 23-1007, —S. Ct.—, 2025 WL 1128943, 2025 U.S. LEXIS 1458 (Apr. 17, 2025).

92.    ***Schlichter Bogard performed a long and thorough investigation of Northrop Grumman's Plan and persisted in the face of NG's Failure to Comply with ERISA's requirement to furnish its Plan Document***. The Firm has been investigating NG and the Plan for more than five months, and did not file this case without obtaining the necessary documents to be sure of Defendants' actions and inactions. On behalf of Plaintiff Steven Kawakami, the Firm repeatedly requested the Plan Document, as is his right under Section 104(b)(4) of ERISA. Not only did Defendants fail to respond, in violation of ERISA, but they did so repeatedly. It was only because Schlichter Bogard persisted over months that Defendants finally produced the Plan Document on April 15, 2025.

93.    Specifically, the Firm's work on this action began on October 23, 2024. After devoting several hours of research into Defendants' handling of the Plan, but without the benefit

of the Plan Document, Mr. Kawakami sent NG a request for the Plan Document through the Firm's counsel on November 11, 2024.

94.    In direct contravention of ERISA Section 104(b)(4), neither NG nor its agent provided the information within the required thirty-day timeframe. § 1132(c)(1). The right to this information available to all 401(k) plan participants in every plan is so embedded in ERISA that it establishes a daily penalty for failure to provide it. *See id.*

95.    Then, on December 20, 2024, Mr. Kawakami sent a second request to NG for the Plan Document, again through the Firm's counsel. Once again, in direct contravention of ERISA Section 104(b)(4), neither NG nor its agent responded, 29 U.S.C. § 1024(b)(4), within the required thirty-day timeframe. § 1132(c)(1).

96.    On March 18, 2025, Mr. Clouse telephoned NG to request a copy of the Plan Document. NG agreed to send Mr. Clouse the Plan Document during that telephone call, but only through First Class Mail. Despite clearly being aware of the request, and despite committing to produce the Plan Document to which Mr. Clouse is entitled, NG failed to provide the requested information, producing only a participant disclosure packet on April 1, 2025, again in express contravention of ERISA Section 104(b)(4). *See* 29 U.S.C. § 1024(b)(4). NG did not provide the Plan Document.

97.    NG's continued refusal to provide Plan information to Plaintiffs—who are current Plan participants—has resulted in ongoing, daily violations of ERISA Section 104(b)(4), for which NG is liable. *See, e.g.*, *Sedlack v. Braswell Servs. Grp.*, 134 F.3d 219, 225–26 (4th Cir. 1998) (citing 29 U.S.C. § 1132(c)).

98.    At long last, on April 15, 2025, Fidelity Investments Institutional Operations Company, LLC, on behalf of NG, sent Mr. Clouse the Plan Document by First Class Mail.

99.    In the interim, another action was filed—*Garner v. Northrop Grumman Corp.*, No. 1:25-CV-00439 (E.D. Va. Mar. 11, 2025). Plaintiffs herein could have filed this action sooner, based on "information and belief," but wanted to ensure that their investigation was thorough, accurate, and complete, and that they had the Plan Document for analysis before filing this action. Court. Further, had Defendants complied with their obligation to produce the Plan Document, Plaintiffs would have had the necessary information and document in November or early December 2024, almost five months sooner.

100.    To date, excluding the preparation of this filing, the Firm has expended 114.20 attorney hours in connection with its investigation into the matters alleged herein.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

### Count I: Failure to Follow the Terms of the Plan
### (29 U.S.C. § 1104(a)(1)(D))

101.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

102.    Defendants are and at all relevant times were required to discharge their fiduciary duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

103.    When exercising discretionary control over forfeited Plan assets and using them to reduce NG's employer matching contributions, Defendants failed to discharge their duties in accordance with the Plan Document, thereby violating ERISA.

a. *First*, after waiting for five (5) years before disturbing the Plan's forfeiture assets following a participant's termination from NG's employ, the Plan Document requires (and at all times required) Defendants first to use the Plan's forfeiture assets to offset the Plan's administrative expenses, and, only if the Plan's forfeiture assets fully satisfied the Plan's administrative expenses, are Defendants permitted to use the remainder to reduce NG's own obligations to make matching contributions. The Plan Document gives and at all relevant times gave no discretion to Defendants to reverse this order of priority. Defendants violated this provision of the Plan Document insofar as they took 100% of the Plan's forfeiture assets for their own benefit: to reduce NG's own obligations to make matching contributions to participants and not to offset any of the Plan's administrative expenses, causing Plaintiffs to shoulder 100% of the burden of those expenses.

b. *Second*, the Plan Document requires and at all times required Defendants to hold in escrow all unvested benefits of terminated employees—which are and at all relevant times were Plan assets—for a period of no less than five (5) years before Defendants could use those Plan assets for any purpose other than to reinstate a participant's account upon rehire. Defendants violated this provision of the Plan Document insofar as they used 100% of the Plan's forfeiture assets to reduce NG's own obligations to make matching contributions to participants and not to reinstate a participant's account upon rehire.

104.    As a direct and proximate result of Defendants' conduct, NG economically benefited itself by saving millions of dollars each year in employer matching contributions at the expense of Plan participants and beneficiaries.

105.    Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

106.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1104(a)(1)(D).

107.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breach of their duty to follow the terms of the Plan alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

### Count II: Breach of ERISA's Statutory Fiduciary Duty of Loyalty
### (29 U.S.C. § 1104(a)(1)(A))

108.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

109.    Defendants are and at all relevant times were required to manage the assets of the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)–(ii).

110.    Throughout the Class Period, Defendants breached their ERISA fiduciary duty of loyalty by, among other things, using the Plan's assets to the benefit of NG, rather than solely in the interest of Plan participants and beneficiaries. Instead of using forfeited Plan assets to reduce or eliminate the administrative expenses charged to Plan participants, Defendants instead used their discretionary power and control to choose to reduce NG's mandatory employer matching contributions. This conduct directly benefited NG by saving it millions of dollars each year in

contractually mandatory matching contributions, and directly worked to the detriment of the Plan and its participants by requiring the Plan's participants and beneficiaries to shoulder 100% of the Plan's administrative expenses themselves, notwithstanding that liquid Plan assets were available to pay 100% of the Plan's administrative expenses during the entire six-year Class Period.

111.    Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

112.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1104(a)(1)(A).

113.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

### Count III: Breach of ERISA's Statutory Fiduciary Duty of Prudence
### (29 U.S.C. § 1104(a)(1)(B))

114.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

115.    Defendants are and at all relevant times were required to manage the assets of the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

116.    Throughout the Class Period, Defendants breached their ERISA duty of prudence by, among other things, failing to use the Plan's assets to pay the Plan's administrative expenses and instead used such assets to benefit NG by reducing its employer matching contributions to the

Plan. In using their discretionary power and control to allocate forfeitures for the benefit of NG, Defendants used an imprudent and flawed decision-making process to determine what was in the best interest of Plan participants, despite Defendants' clear conflict of interest when making this decision that favored NG's corporate interests.

117.    Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

118.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1104(a)(1)(B).

119.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

### Count IV: Liability for Breaches of Co-Fiduciaries' Statutory Fiduciary Duty of Loyalty (29 U.S.C. §§ 1104(a)(1)(A)(i), 1105)

120.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

121.    As fiduciaries, Defendants were required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," "for the exclusive purpose of providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i).

122.    As fiduciaries, each Defendant also is liable for "the acts of another fiduciary with respect to the same plan" in the following circumstances:

    a.  if it participated knowingly in, or knowingly undertook to conceal, and act or omission of such fiduciary, knowing such act or omission was a breach;

    b.  if, by its failure to comply with 29 U.S.C. § 1104(a)(1) in the administration of its specific responsibilities which gave rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

    c.  if it had knowledge of a breach by such other fiduciary, unless it made reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

123.    Defendants breached their fiduciary duties of loyalty, as alleged in Count II.

124.    NG knew of the Committee's breaches of the ERISA fiduciary duty of loyalty because, among other things, at all relevant times, NG's Chief Executive Officer appointed all of the Committee members, who served at the pleasure of the Chief Executive Officer.

125.    The Committee knew of NG's breaches of the ERISA fiduciary duty of loyalty because, among other things, at all relevant times, the Committee's consent was required to withdraw Plan assets, including forfeiture assets, from the Master Trust, to pay NG's employer contributions.

126.    With full knowledge that its co-fiduciaries were violating the ERISA fiduciary duty of loyalty, each Defendant also undertook to conceal each other's breaches of the fiduciary duty of loyalty by, among other things, misrepresenting the terms of the Plan Document in the Plan's annual Forms 5500, publicly filed with DOL, which falsely state that NG had the discretion to use Plan forfeiture assets either to pay Plan expenses or to reduce employer contributions. In reality, the Plan Document requires, and at all relevant times required, Defendants to use any Plan

forfeiture assets to pay Plan expenses before using them for any other purpose, including reducing NG's employer contributions, for each year during the Class Period.

127.    Although each Defendant knew of the other Defendants' fiduciary breaches, none of the Defendants undertook any reasonable efforts to remedy those breaches.

128.    Defendant NG deliberately and intentionally concealed the fiduciary breaches of the other Defendants by refusing to provide the Plan Document which would have revealed those breaches, in violation of Section 104(b)(4) of ERISA (29 U.S.C. § 1024(b)(4)).

129.    By reason of the foregoing, each Defendant violated 29 U.S.C. § 1105.

130.    As a result, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**Count V: Liability for Breaches of Co-Fiduciaries'**
**Statutory Fiduciary Duty of Prudence**
**(29 U.S.C.  §§ 1104(a)(1)(A)(ii), 1105)**

131.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

132.    As fiduciaries, Defendants were required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)(ii).

133.    As fiduciaries, each Defendant also is liable for "the acts of another fiduciary with respect to the same plan" in the following circumstances:

a. if it participated knowingly in, or knowingly undertook to conceal, an act or omission of such fiduciary, knowing such act or omission was a breach;

b. if, by its failure to comply with 29 U.S.C. § 1104(a)(1) in the administration of its specific responsibilities which gave rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

c. if it had knowledge of a breach by such other fiduciary, unless it made reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

134.    Defendants breached their fiduciary duties of prudence, as alleged in Count III.

135.    NG knew of the Committee's breaches of the ERISA fiduciary duty of prudence because, among other things, at all relevant times, NG's Chief Executive Officer appointed all of the Committee members, who served at the pleasure of the Chief Executive Officer.

136.    The Committee knew of NG's breaches of the ERISA fiduciary duty of prudence because, among other things, at all relevant times, the Committee's consent was required to withdraw Plan assets,  including forfeiture assets, from the Master Trust, to pay NG's employer contributions.

137.    With full knowledge that its co-fiduciaries were violating the ERISA fiduciary duty of prudence, each Defendant also undertook to conceal each other's breaches of the fiduciary duty of loyalty by, among other things, misrepresenting the terms of the Plan Document in the Plan's annual Forms 5500, publicly filed with DOL, which falsely state that NG had the discretion to use Plan forfeiture assets either to pay Plan expenses or to reduce employer contributions. In reality, the Plan Document requires, and at all relevant times required, Defendants to use any Plan

forfeiture assets to pay Plan expenses before using them for any other purpose, including reducing NG's employer contributions, for each year during the Class Period.

138.     Although each Defendant knew of the other Defendants' fiduciary breaches, none of the Defendants undertook any reasonable efforts to remedy those breaches.

139.     Defendant NG deliberately and intentionally concealed the fiduciary breaches of the other Defendants by refusing to provide the Plan Document which would have revealed those breaches, in violation of Section 104(b)(4) of ERISA (29 U.S.C. § 1024(b)(4)).

140.     By reason of the foregoing, each Defendant violated 29 U.S.C. § 1105.

141.     As a result, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### Count VI: Failure to Monitor Fiduciaries
### (29 U.S.C.  §§ 1104(a)(1)(A)(ii))

142.     Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

143.     Defendants' fiduciary responsibility for overseeing the Plan included monitoring all other fiduciaries appointed or hired to manage the Plan on a quotidian basis, including the  day-to-day responsibility of safeguarding and prudently directing the usage, transfer, and movement, of Plan assets, including the forfeiture assets at issue.

144.     A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are discharging those duties as ERISA's strict fiduciary standards mandate. In particular, NG remained responsible as an appointing fiduciary to monitor the actions of the Committee to ensure that it carried out its fiduciary obligations loyally and prudently. NG, as the Plan's sponsor and named fiduciary, and through its delegation of authority to the Committee, the Plan's

administrator and also a named fiduciary, remained responsible for monitoring the actions of the Committee, and all other fiduciaries, with respect to safeguarding and prudently directing the usage, transfer, and movement of Plan assets, including the forfeiture assets at issue.

145.    Defendants violated their fiduciary monitoring duties by failing to ensure, among other things, that their fiduciary delegees' actions with respect to Plan assets, including the forfeiture assets at issue, (1) complied with the terms of the Plan Document, (2) were not disloyal, (3) were not imprudent, (4) did not inure to the benefit of any Defendant, and (5) were not transactions prohibited by ERISA.

146.    Had Defendants adequately discharged their fiduciary monitoring duties, Defendants (1) would have used the Plan's forfeiture assets to pay all of the Plan's administrative expenses during each year of the Class Period and (2) would not have used the Plan's forfeiture assets to reduce NG's employer contributions in any year during the Class Period.

147.    Had Defendants adequately discharged their fiduciary monitoring duties, the Plan would not have been harmed because (1) the value of Plaintiffs' retirement accounts would not have been adversely impacted and (2) Plaintiffs would not have been injured.

148.    As a direct and proximate result of Defendants' failure to discharge their fiduciary monitoring duties adequately, Plaintiffs have been injured.

### Count VII: Breach of ERISA's Anti-Inurement Provision
### (29 U.S.C. § 1103(c)(1))

149.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

150.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

151.    Defendants failed to use Plan assets to benefit Plan participants by reducing or eliminating Plan administrative expenses. Instead, Defendants chose to benefit themselves by reducing NG's obligation to pay its contractually imposed employer matching contributions. By decreasing NG's out-of-pocket costs to make its contractually imposed matching contributions, NG saved millions of dollars each year at the expense and to the detriment of the Plan and its participants. As a result, Defendants caused the assets of the Plan to inure directly to the benefit of NG directly at the expense and to the detriment of Plaintiffs.

152.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1103(c)(1).

153.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

### Count VIII: Prohibited Transactions
### (29 U.S.C. § 1106(a)(1))

154.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

155.    Section 406(a) of ERISA prohibits transactions between a plan and a party in interest. 29 U.S.C. § 1106(a). Pursuant to 29 U.S.C. § 1106(a)(1), "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such

transaction constitutes a direct or indirect — (A) exchange . . . of any property between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

156.    NG is and at all relevant times was a party in interest because it is and at all relevant times was a Plan fiduciary, as it is and at all relevant times was (i) identified in the Plan Document as a named fiduciary, (ii) the Plan's sponsor, and (iii) an employer of employees covered by the Plan. 29 U.S.C. §§ 1002(14)(A), 1002(14)(C), 1102(a)(2).

157.    The Committee, including but not limited to John Does 1–10, is and at all relevant times was a party in interest because it is and at all relevant times was a Plan fiduciary, as it is and at all relevant times was (i) identified in the Plan Document as a named fiduciary and (ii) the Plan's administrator. 29 U.S.C. §§ 1002(16)(A)(i), 1102(a)(2).

158.    Defendants caused the Plan to use Plan assets to fund NG's obligations to make matching contributions to Plan participants. Defendants therefore caused the Plan (1) to engage in transactions they knew or should have known constituted an exchange of property (Plan assets) to NG to pay employer matching contributions in contravention of 29 U.S.C. § 1106(a)(1)(A); and (2) to engage in transactions that Defendants knew or should have known constituted the use of Plan assets for the benefit of NG by reducing NG's obligations to fund its own obligations to the Plan, in the form of employer matching contributions, all in violation of 29 U.S.C. § 1106(a)(1)(D). This prohibited conduct saved NG millions of dollars annually by eviscerating NG's obligation to fund its own contractual obligations to the Plan at the expense of the Plan and its participants.

159.    Defendants caused the Plan to suffer losses in the amount of the Plan assets that were used to pay employer matching contributions, in addition to the lost investment returns on those assets because of these prohibited transactions.

160.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1106(a).

161.    Furthermore, each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count which encompasses the Plan's payment of administrative expenses incurred by participants. Each Defendant is also subject to other equitable or remedial relief as appropriate, including disgorgement of all sums received.

### Count IX: Prohibited Transactions
### (29 U.S.C. § 1106(b)(1−3))

162.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

163.    Section 406(b) of ERISA prohibits transactions between a plan and a fiduciary. 29 U.S.C. § 1106(b). Pursuant to 29 U.S.C. § 1106(b), "[a] fiduciary with respect to a plan shall not — (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

164.    Defendants were Plan fiduciaries and caused the Plan to use Plan assets to fund NG's contractual obligation to make matching contributions to the Plan. Defendants therefore dealt with the assets of the Plan in their own interest or for NG's own account in contravention of 29 U.S.C. § 1106(b)(1); acted in a transaction involving the Plan on behalf of a party (NG) whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in

contravention of 29 U.S.C. § 1106(b)(2); and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan in contravention of 29 U.S.C. § 1106(b)(3). This prohibited conduct saved NG millions of dollars annually by eviscerating NG's obligation to fund its own contractual obligations to the Plan at the expense of the Plan and its participants.

165.    Defendants caused the Plan to suffer losses in the amount of the Plan assets that were used to pay employer matching contributions, and the lost investment returns on those assets because of these prohibited transactions.

166.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1106(b).

167.    Furthermore, each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count which encompasses the Plan's payment of avoidable administrative expenses incurred by participants. Each Defendant is also subject to other equitable or remedial relief as appropriate, including disgorgement of all sums received.

### Count X: Statutory Penalties for Failure to Provide Plan Information
### (29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B))

168.    Plaintiffs restate, reallege, and incorporate by reference herein the allegations contained in each and every preceding paragraph of this Complaint as though those allegations were fully set forth herein.

169.    Section 104(b)(4) of ERISA provides, in pertinent part, that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

29 U.S.C. § 1024(b)(4).

170.    For purposes of the foregoing statutory obligation, NG is the "administrator" of the Plan. *See, e.g.*, 29 U.S.C. § 1002(16)(A).

171.    An administrator who fails to provide an ERISA plan participant or beneficiary with plan documents within thirty (30) days of a written request for such documents is liable to each affected participant or beneficiary in an amount of up to One Hundred Ten United States Dollars (USD $110.00) *per diem. See* 29 U.S.C. § 1132(c)(1)(B); 29 C.F.R. § 2575.502c-1.

172.    An ERISA plan document or plan instrument is among the materials specifically enumerated in ERISA's Section 104(b)(4) because it is an "instrument[] under which the plan is established or operated." 29 U.S.C. § 1024(b)(4); *see, e.g., Kelly v. Altria Client Servs., LLC*, No. 23-CV-725-HEH, 2024 U.S. Dist. LEXIS 241229, at *14 (E.D. Va. Aug. 1, 2024) (citations omitted).

173.    Mr. Kawakami made two written requests of NG for a copy of the operative Plan Document.

174.    On November 11, 2024, Mr. Kawakami sent NG a written request for the Plan Document through the undersigned Firm's counsel. The Plan Document is an instrument under which the Plan is "operated" pursuant to 29 U.S.C. § 1024(b)(4).

175.    NG was obligated to provide Mr. Kawakami with a copy of the Plan Document by no later than December 11, 2024 to avoid potential penalties.

176.    Nevertheless, NG failed to provide the Plan Document to Mr. Kawakami or the Firm's counsel by December 11, 2024.

177.    On December 20, 2024, Mr. Kawakami sent NG a written request for the Plan Document through the undersigned Firm's counsel. The Plan Document is an instrument under which the Plan is "operated" pursuant to 29 U.S.C. § 1024(b)(4).

178.    NG was obligated to provide Mr. Kawakami with a copy of the Plan Document by no later than January 20, 2025 to avoid potential penalties.

179.    Nevertheless, NG failed to provide the Plan Document to Mr. Kawakami or the Firm's counsel by January 20, 2025.

180.    On March 18, 2025, Mr. Clouse telephoned NG to request a copy of the Plan Document. NG agreed to send Mr. Clouse the Plan Document during the telephone call, but only through First Class Mail. In any event, NG failed to provide the requested information producing only a participant disclosure packet on April 1, 2025. NG did not include the Plan Document in the participant disclosure packet.

181.    NG finally caused the Plan Document to be sent to Mr. Clouse by First Class Mail on April 15, 2015.

182.    A total of one hundred fifty-six days (156) days elapsed between the time Mr. Kawakami first requested the Plan Document and the time it was received in response to Plaintiffs' requests.

183.    By reason of the foregoing, Defendants violated 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B).

184.    For their violations of 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B), Defendants are liable to Plaintiffs in the amount of Seventeen Thousand, One Hundred Sixty United States Dollars ($17,160.00) in statutory penalties.

185.    Defendants also are liable to Plaintiffs for reasonable attorneys' fees, and for all other appropriate relief under ERISA, for which prayer is made hereinafter, for having to litigate this particular issue in this action.

## JURY TRIAL DEMANDED

186.    Pursuant the Seventh Amendment to the Constitution of the United States of America, and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable in this action or, alternatively, an advisory jury.

## PRAYER FOR RELIEF

NOW, WHEREFORE, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, pray this Court's relief and judgment, as follows:

- find and declare that Defendants have breached ERISA inasmuch as they (1) failed to follow the terms of the Plan Documents, in contravention of ERISA; (2) breached their ERISA-imposed and ERISA-defined fiduciary duties of loyalty and prudence; (3) violated ERISA's anti-inurement provision; (4) engaged in conduct and transactions expressly prohibited by ERISA; (5) failed to monitor the Plan's fiduciaries in contravention of their fiduciary duties arising under ERISA; and (6) enabled the Plan's fiduciaries to breach their fiduciary duties arising under ERISA, all by reason of the unlawful conduct alleged hereinabove;

- find, adjudge, and decree that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each and every ERISA violation described above, and otherwise to restore the Plan to the position it would have occupied but for the unlawful conduct alleged hereinabove;

- order Defendants to disgorge all assets and profits they secured as a direct and proximate result of each and every violation of ERISA alleged hereinabove;

- determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

- enjoin the fiduciaries who have breached their ERISA-imposed and ERISA-defined fiduciary duties with respect to the Plan from engaging in future ERISA violations;

- order surcharge against Defendants and in favor of the Plan all amounts involved in each and every transaction for which such accounting reveals was improper, excessive, or otherwise in contravention of ERISA;

- find and declare that Defendants violated 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B) by failing to provide the plan instrument to plaintiffs for a period of one hundred fifty-six (156) days;

- order Defendants to pay statutory penalties to Mr. Kawakami for Defendants' violations of 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B);

- certify the Class defined hereinabove, appoint the Plaintiffs as Class Representatives, and appoint Schlichter Bogard LLC as Class Counsel;

- award to the Class Representatives and the Class their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- order the payment of pre-judgment interest;

- order the payment of post-judgment interest to the extent it is allowed by law; and

- grant such other and further equitable or remedial relief as the Court deems just and proper under the circumstances.

May 2, 2025

Respectfully submitted,

BRIAN E. CLOUSE, STEVEN S. KAWAKAMI,
DOUGLAS E. HOFFELT, and MICHAEL
WINKLER, individually and as representatives of a
class of participants and beneficiaries on behalf of
the NORTHROP GRUMMAN SAVINGS PLAN,

By Counsel

By: /s/ Sean Patrick Roche
Sean Patrick Roche, Esq. (VSB No. 71412)
CAMERON INGERSOLL ROCHE PLLC
4100 Monument Corner Drive, Suite 420
Fairfax, VA 22030
Telephone: (703) 460-9343
Facsimile: (703) 273-8897
sroche@cirlaw.com
*Local Counsel for Plaintiffs*

By: /s/ Jerome J. Schlichter
Jerome J. Schlichter (*pro hac vice* to be filed)
Troy A. Doles (*pro hac vice* to be filed)
Andrew D. Schlichter (*pro hac vice* to be filed)
Nathan Stump (*pro hac vice* to be filed)
Kurt C. Struckhoff (*pro hac vice* to be filed)
Terrence W. Scudieri, Jr. (*pro hac vice* to be filed)
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: +1 (314) 621-6115
Facsimile: +1 (314) 621-5934
jschlichter@uselaws.com
tdoles@uselaws.com
aschlichter@uselaws.com
nstump@uselaws.com
kstruckhoff@uselaws.com
tscudieri@uselaws.com
*Lead Counsel for Plaintiffs & the Proposed Class*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Brian E. Clouse, Steven S. Kawakami, Douglas E. Hoffelt, and Michael Winkler et al. | Northrop Grumman Corporation, the Northrop Grumman Benefit Plan Administrative Committee, and John Does 1-10 |

| (b)  County of Residence of First Listed Plaintiff   Seminole County, FL | County of Residence of First Listed Defendant   Fairfax County, VA |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c)  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Sean Patrick Roche, Esq., Cameron Ingersoll Roche PLLC, 4100 Monument Corner Dr., Ste. 420, Fairfax, VA 22030, (703) 460-9343 | |

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
Plaintiff
- [x] 3  Federal Question
*(U.S. Government Not a Party)*
- [ ] 2  U.S. Government
Defendant
- [ ] 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                           Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[x] 791 Employee Retirement Income Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |
| | | | **IMMIGRATION** | | |
| | | | [ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §§ 1132(a)(2) and (a)(3); 29 U.S.C. §§ 1001–1461; 29 U.S.C. § 1109(a)

Brief description of cause:
Breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974

**VII. REQUESTED IN COMPLAINT:**   [x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.   DEMAND $   CHECK YES only if demanded in complaint:   JURY DEMAND:   [x] Yes   [ ] No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE   Claude M. Hilton   DOCKET NUMBER   1:23cv439

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 5/2/2025 | /s/ Sean Patrick Roche, Esq.   (VSB No. 71412) |

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions.</u>

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.